IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TYSON COLEMAN,** : | |
| **Plaintiff** : | |
| : | CIVIL ACTION |
| : | No. 02-9065 |
| : | |
| **THE CITY OF PHILADELPHIA, et al.,** : | |
| **Defendant** : | |
| : | |
| _____ : | |

**MEMORANDUM OPINION AND ORDER**

**RUFE, J.**                                                                                        **September 28, 2005**

Before the Court is Defendants' Motion for Summary Judgment in this civil rights action brought by Plaintiff Tyson Coleman ("Plaintiff" or "Coleman"). Defendants, Michael O'Kane, Roosevelt Gibbs, Maurice Hampton, Rodney Polliard, Viviana Ramos, and Curtis Matthews, are (or were at the time of the alleged violations) Philadelphia police officers. Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983 (2000), and allege false arrest/false imprisonment, malicious prosecution, conspiracy, and bystander liability. The basis for Plaintiff's suit is an encounter that he had with Defendants on the afternoon of November 25, 1997. For the reasons set forth below, the Court grants Defendants' Motion for Summary Judgment.

**I.      Background**

At approximately 1:00 p.m. on November 25, 1997, a woman called the Philadelphia Police Department to lodge a complaint. What follows are the relevant portions of the transcript of the complainant's call to the police:

RADIO:      Philadelphia Police, Operator 180, how may I help you?

CALLER:     H-hi! I, um, called - the, the cops was here last night . . . at my house so, um . . . uh, um somebody pulled a gun on me and –

RADIO:      Okay

CALLER:     And you were looking for 'im last night and –

RADIO:      Uh-huh

CALLER:     He's sitting right on Montgomery Avenue, on 31st, and Montgomery in a brown car, like a Oldsmobile or Buick or somethin'. I can see 'im from my window . . . but he can't see me lookin' out the window. He's just sitting there in a car. I called his probation officer. They told me ta [sic] write . . . a letter and come down to Broad and Spring Garden to get it notarized.

RADIO:      Right

CALLER:     You know so they wanna pick 'im up but they say they just can't go to his house lookin' for a gun and everything.

RADIO:      Okay, he's a black male? He's in what kind of a car?

CALLER:     It's a brown, it look [sic] [like] a Buick. It's a Buick or Oldsmobile, 4-door . . . It looks like it's a 4-door but it's brown. It's him and another guy and he got on a red jacket, a red Polo jacket. I can see 'im from my window . . . and they just sittin' there.

RADIO:      So it's two of 'em in there, right?

CALLER:     Uh-huh . . . . He's just sittin' there. I guess - there he goes. He at the phone booth now at 31st and Montgomery.

RADIO:      But the one with the red jacket is the one that had the gun, right?

CALLER:     Yeah . . . .

| | |
|---|---|
| RADIO: | Okay, ma'am, the only thing is, is what we're gonna have to do, is officer coming to your house– |
| CALLER: | Huh? |
| RADIO: | I'm gonna send 'em to 31st and Montgomery to get him? |
| CALLER: | Uh-huh |
| RADIO: | But we also wanna have, you have to verify that that's the person. |
| CALLER: | Y'all gonna bring 'im here? |
| RADIO: | Yeah, they'll, they'll they'll bring 'im around! |
| CALLER: | Okay |
| RADIO: | Okay, and what's your address? |
| CALLER: | . . . 3103 Euclid Street |
| RADIO: | Okay, I'll let them know that, okay? |
| CALLER: | Let them know DON'T COME HERE FIRST 'cause if he see the cops he said . . . yeah, he said if he see [sic] the cops – |
| RADIO: | No, we're going to 31st and Montgomery. That's where I'm putting 'em so you want 'em to go there. |
| CALLER: | Okay, I have to go now! I'm lookin' and the car is still there! My phone ringing [sic] so . . . he's at the phone booth callin' my house! |
| RADIO: | And you're at 3101[1] Euclid, right? |
| CALLER: | Uh-huh[2] |

---

[1] The transcript reveals that, although the complainant gave her address as *3103* Euclid Street, the police operator repeated the complainant's address as *3101* Euclid Street.

[2] Def. Ex. A at 1-2.

3

At 1:04 p.m., a police dispatcher announced the following over police radio:

> RADIO: Cars stand by. 22nd District, 3 - 1 and Montgomery, person with a gun. It's gonna be a male inside of a brown Buick. It's gonna be a black male, wearing a red jacket . . ., it's coming out person with a gun . . . be a black male wearing a red jacket occupying a brown Buick. We have a female complainant at 3101 Euclid Street.[3]

At approximately 1:05 p.m., police officer Roosevelt Gibbs ("Gibbs") radioed dispatch that he was reporting to 31st Street and Montgomery Avenue.[4] After acknowledging that Gibbs was reporting to the scene, the dispatcher requested backup for Gibbs. Officer Michael O'Kane ("O'Kane") radioed that he, too, was reporting to the scene.[5]

Gibbs arrived at 31st Street and Montgomery Avenue seconds before O'Kane.[6] At that intersection, Gibbs observed two men sitting in a brown car and noted that one of the men was wearing a red jacket.[7] Gibbs pulled his patrol vehicle, overhead lights flashing, directly in front of the brown vehicle occupied by the two men and ordered them not to move. Then, Gibbs went to approach the brown vehicle, but the man wearing the red jacket fled the car's passenger side.[8]

As O'Kane arrived,[9] he saw a man in a red jacket exiting the only brown vehicle at

---

[3] Def. Ex. A at 2.

[4] Def. Ex. B at 17-18.

[5] See Def. Ex. A at 2; Pl. Ex. B at 7.

[6] See Def. Ex. B at 7.

[7] Def. Ex. B at 18.

[8] Def. Ex. B at 18-19.

[9] The record does not reflect the configuration of the three vehicles. The record is clear that Gibbs pulled directly in front of the brown car, but where O'Kane exited his car in relation to the other two is not clear. However, Gibbs testified at Plaintiff's suppression hearing in state court that the vehicles were situated in such a way that the brown car could only maneuver out of the configuration if it "[went] up on the sidewalk." Pl. Ex. A at 22-23.

4

the corner of 31st Street and Montgomery Avenue.[10]  Immediately, O'Kane exited his patrol car and pursued the subject on foot northeast on Sedgley Avenue.  As O'Kane pursued the man, he radioed his location and status in to the police.[11]  A police dispatcher announced over the radio that O'Kane was in foot pursuit of a black male, wearing a red jacket, who was possibly armed with a gun, and requested additional backup.[12]  O'Kane chased Plaintiff down an alley backing Sedgley Avenue.  He saw Plaintiff throw "a gray and black 'L' shaped object into the yard behind" 3035 Sedgley Avenue just prior to running into the abandoned house at 3037 Sedgley Avenue.[13]  O'Kane did not immediately follow Plaintiff into the building.  Rather, he waited outside the rear entrance for backup to arrive.[14]

Soon, the other Defendants arrived at the abandoned house to help O'Kane apprehend Plaintiff.[15]  When the other officers arrived, O'Kane informed Officer Dwayne Merrell ("Merrell") that during the chase he saw Coleman discard what appeared to be a gun behind 3035 Sedgley Avenue.[16]  O'Kane instructed Merrell to check the yard for a weapon.[17]  Merrell entered the backyard, where he found a nine-millimeter Ruger semi-automatic pistol.[18]  The other officers

---

[10] Def. Ex. B at 8, 9-10.

[11] Def. Ex. B at 8; Def. Ex A at 2.

[12] Def. Ex. A at 2-3.

[13] Def. Ex. B at 8-9.

[14] Def. Ex. A at 3; Pl. Ex. A at 2.

[15] Pl. Ex. A at 3-5.

[16] Pl. Ex. A at 2, 5.

[17] Id.

[18] Pl. Ex. A at 5.

entered the abandoned house where, after a brief struggle, they eventually apprehended Plaintiff in the basement.[19] Plaintiff was charged with aggravated assault, carrying a firearm without a license, carrying a firearm in a public place, possession of a firearm by a convicted violent criminal, possession of instruments of crime, simple assault, recklessly endangering a person, and resisting arrest.[20]

During criminal proceedings in the Philadelphia Court of Common Pleas, Plaintiff filed a Motion to Suppress the gun that was recovered from the backyard.[21] At his suppression hearing, Coleman argued that he was forced to abandon his property as the result of an illegal seizure.[22] The Court of Common Pleas agreed and concluded that Coleman was seized when Gibbs and O'Kane arrived on the scene and used their patrol cars to surround the brown car in which Plaintiff was sitting.[23] The court deemed the seizure to be unreasonable under the Pennsylvania Constitution because the officers lacked the requisite reasonable suspicion to seize the car's occupants.[24] Consequently, the court dismissed all charges related to the firearm.[25]

---

[19] Def. Ex. A at 6.

[20] Pl Ex. D at 1.

[21] See Pl. Ex. A.

[22] Pl. Ex. B at 28.

[23] Pl. Ex. A at 31.

[24] The Court of Common Pleas relied on Commonwealth v. Jackson, 698 A.2d 571 (Pa. 1997), Commonwealth v. Matos, 672 A.2d 769 (Pa. 1996), and Commonwealth v. Queen, 639 A.2d 443 (Pa. 1994) to determine the reasonableness of Coleman's seizure. Those cases do not bind this Court, nor do they address the seminal issue presented by Coleman's current federal action: whether the police officers acted reasonably under the Fourth Amendment to the United States Constitution when the officers seized a black man, who was wearing a red jacket and sitting in a parked brown car, based on information received from a complainant who reported that a black man wearing a red jacket, sitting in a parked brown car at a specific location possessed a gun where the subject of the tip allegedly pulled a gun on the complainant in her home the night before.

[25] Pl. Ex B at 33.

Plaintiff proceeded to a bench trial on the remaining charges of aggravated assault, simple assault, recklessly endangering a person, and resisting arrest.[26] The Court of Common Pleas acquitted Coleman of all charges except the charge of resisting arrest. Plaintiff was sentenced, thereafter, to two years of imprisonment on the resisting arrest charge. On direct appeal, the Superior Court overturned Plaintiff's conviction.[27]

Plaintiff then filed this section 1983 action, along with several state law claims. This Opinion addresses Coleman's section 1983 claims for false arrest/false imprisonment, malicious prosecution, conspiracy, and bystander liability.[28]

## II. Summary Judgment Standard

The Court will enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[29] The nonmoving party bears the burden of producing evidence to establish each element of its claim.[30] Material facts are those that might affect the outcome of the case under governing substantive law.[31]

---

[26] Pl Ex C at 1.

[27] Pl. Ex. C at 1; Pl. Ex. E at 1; Commonwealth v. Coleman, No.102-EDA-2000, slip op. (Pa. Super. Ct. Dec. 15, 2000).

[28] Plaintiff's Complaint states eight causes of action. By Order [Document #11], the Court dismissed Counts I (false arrest) and II (malicious prosecution), insofar as they proceeded under Article I, section 8 of the Pennsylvania Constitution, and Count VI (intentional infliction of emotional distress) as barred by the statute of limitations. By stipulation of the parties [Document #18], the Court dismissed Count III (failure to train and supervise), Count IV (state law false arrest), and Count V (state law malicious prosecution).

[29] Fed. R. Civ. P. 56(c).

[30] Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[31] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

For there to exist "a genuine issue of material fact," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party."[32] The Court must decide whether a sufficient factual dispute exists or whether the facts are "so one-sided that one party must prevail as a matter of law."[33] The Court will view all evidence and draw all reasonable inferences in the light most favorable to Coleman, the nonmoving party, when determining whether or not defendants are entitled to judgment as a matter of law.[34]

### III.   Discussion

As a threshold matter, the Court must determine whether Gibbs and O'Kane seized Plaintiff. To determine whether a seizure occurred "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to . . . terminate the encounter."[35] Plaintiff asserts that he was seized for purposes of the Fourth Amendment at the point where Gibbs and O'Kane surrounded the car he occupied and ordered him to raise his hands,[36] and argues that the Court of Common Pleas's ruling at the suppression hearing that he was seized collaterally estops Defendants from re-litigating the seizure issue here. The Court rejects Plaintiff's collateral estoppel argument,[37]

---

[32] Id.

[33] Id. at 251-52.

[34] See Dici v. Pennsylvania, 91 F.3d 542, 547 (3d Cir. 1996).

[35] Florida v. Bostick, 501 U.S. 429, 434 (1991).

[36] Pl. Resp. To Def.'s Mot. For Summ. J. at 9.

[37] Issues are barred from re-litigation in federal court where: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from re-litigating the issue was fully represented in the prior action." Dam Things From Denmark v. Russ Berrie & Co., Inc., 290 F.3d 548, 559 n.15 (3d Cir. 2002) (internal quotations omitted). In this case, collateral estoppel does not bar litigation of the issue of whether Plaintiff was seized under the Fourth

and likewise rejects Defendants' argument that Plaintiff was not seized because he fled the scene after the police arrived at his location.[38]

Gibbs and O'Kane maneuvered their patrol cars to prevent Plaintiff's car from leaving the scene, approached him flashing overhead lights, and ordered him to put his hands in the air. Under these circumstances, a reasonable person would not feel free to terminate his encounter with the police. Thus, Gibbs and O'Kane seized Plaintiff upon arriving at the scene.

Establishing that Plaintiff was seized under the Fourth Amendment, however, is a preliminary determination since "'it must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'"[39] Therefore, the Court next must decide whether, under the circumstances, Plaintiff's seizure was reasonable. Since Plaintiff summarily asserts two broad positions,[40] it is unclear whether Plaintiff posits that his seizure was an unreasonable investigative stop under Terry v. Ohio[41] or an arrest lacking probable cause. The Court takes up these issues in turn.

---

Amendment because: (1) the Court of Common Pleas did not adjudicate the identical issue now before the Court (the state court ruled that Plaintiff was illegally seized under state law, not the Fourth Amendment) and (2) the Defendants were not parties to Plaintiff's criminal proceeding, thus they were not fully represented in the state court proceeding.

[38] Defendants point to California v. Hodari D., 499 U.S. 621 (1991) and argue that Plaintiff was not seized because he fled the scene as soon as the police told him to put his hands in the air. In Hodari D., the Supreme Court ruled that no seizure had occurred where respondent fled the scene when he saw an unmarked police car turn onto his street. Id. at 621. Unlike respondent in Hodari D., who experienced no police conduct putting him on notice that he was not free to leave, Plaintiff's car was rendered immobile and he was told to put his hands in the air. This conduct notified him that he was not free to leave the scene. Plaintiff's flight subsequent to his seizure is irrelevant to determine whether or not a seizure occurred in the first place. See id. at 625 (quoting Thompson v. Whitman, 18 Wall. 457, 471) ("'A seizure is a single act, not a continuous fact.'").

[39] United States v. Ritter, 416 F.3d 256, 261-62 (3d Cir. 2005) (quoting Elkins v. United States, 364 U.S. 206, 222 (1960)).

[40] Pl. Resp. To Def.'s Mot. for Summ. J. 8.

[41] 392 U.S. 1 (1968).

### A. Reasonable Suspicion for a Terry Stop

Plaintiff argues that the police lacked reasonable suspicion to conduct an investigative stop.[42] Terry and its progeny established that the Fourth Amendment "permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause."[43] The gravamen of the issue in determining whether the police possessed an objectively reasonable suspicion to justifiably seize Plaintiff is whether or not the complainant's reports to the police possessed ample indicia of reliability under the totality of the circumstances.[44]

The following facts are not in dispute: at 1:00 p.m. on November 25, 1997, complainant telephoned the police and informed them that she saw Plaintiff from her window, that he was wearing a red jacket and sitting in a brown car at the corner of 31st Street and Montgomery Avenue, that he was in possession of a firearm, and that he was the same person who threatened her with a gun the night before. Nor are these facts in dispute: at 1:00 p.m. on November 25, 1997, the complainant observed Plaintiff wearing a red jacket, sitting in a brown car at the corner of 31st Street and Montgomery Avenue. Because the police encounter with Plaintiff was based solely on the complainant's call, "the reasonableness of the stop in this case depends on the reliability of the tip itself."[45]

Plaintiff contends that the tip that alerted the police to his location was an unreliable,

---

[42] Pl. Resp. To Def.'s Mot. For Summ. J. 8.

[43] Florida v J.L., 529 U.S. 266, 272 (2000).

[44] See United States v. Nelson, 284 F.3d 472, 481 (3d Cir. 2002).

[45] Id.

10

anonymous tip. Plaintiff argues that the information provided by the complainant provided no more information than what was readily observable from any window in the vicinity of his location on the afternoon in question, and is therefore a violation of his Fourth Amendment rights.[46] Plaintiff builds his argument on the teachings of Florida v. J.L., *supra*.

        In J.L., an anonymous caller reported to the Miami-Dade Police that a young black man standing at a specific bus stop and wearing a plaid shirt was carrying a gun. Thereafter, two police officers responded to the bus stop mentioned in the tip, where they found three young black men, one wearing a plaid shirt. One officer approached the young man in the plaid shirt, frisked him, and found a gun.[47] The issue presented in J.L was "whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's [investigative stop] of that person."[48] The J.L. court ruled that there was no reasonable suspicion to stop respondent because "[a]ll the police officers had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [respondent]."[49]

        Plaintiff's reliance on J.L. is misplaced: the disparity between the tips and the tipsters in the two cases is significant. In J.L., the police did not know the name, identity, or location of the anonymous tipster. Here, although the police operator did not record the name of the complainant at the time of her call, she gave her address, explained that the police had been to her home the

---

[46] See Pl. Resp. To Def.'s Mot. For Summ. J. 7-8.

[47] J.L., 529 U.S. at 268.

[48] Id.

[49] Id. at 271.

previous night because the man she reported had pulled a gun on her, informed the operator that the subject of her call was on probation, and gave the police permission to come to her home to investigate the matter further. Given these facts, it is illogical to assert that the complainant was anonymous: not only had the police responded to complainant's call for help the previous night concerning the same man, they were reasonably assured that they could find the complainant if she was needed to verify her oral report or to hold her responsible if she provided false information, notwithstanding the mistaken communication about her address.

    Moreover, in J.L., the Supreme Court concluded that "an accurate description of a subject's readily observable location and appearance," although reliable for purposes of helping the police to identify the target of the tipster's accusation, "does not show that the tipster has knowledge of concealed criminal activity."[50] Here, the complainant revealed sufficient knowledge of criminal activity not readily knowable to the general public. Specifically, she stated that Plaintiff had pulled a gun on her the night before, she stated that Plaintiff continued to linger at the corner of her street, that he was on probation, and that he was telephoning her while she was reporting him to the police. These factors, in the aggregate, indicate that the complainant possessed knowledge of Plaintiff's criminal activity. Finally, the fact that the complainant was able to report Plaintiff's activities contemporaneously lends significant weight to her reliability.[51] Based on the foregoing, Gibbs and O'Kane acted upon reliable information and, therefore, reasonably under the circumstances when they responded to the radio call concerning Plaintiff, obstructed his potential escape, and instructed

---

[50] Id. at 272.

[51] See United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000) (giving greater weight to a tip reporting what the tipster saw moments ago, as opposed to information gleaned from "stale or second-hand sources.").

him to put his hands in the air.

## B. Probable Cause to Arrest

Plaintiff also argues that the police lacked probable cause to arrest him.[52] However, Plaintiff does not explain what activity he considers to have constituted his arrest. There are only two avenues that Plaintiff can take for this argument: either Plaintiff contends that his seizure in the car was elevated to a de facto arrest achieved without probable cause, or he contends that the police lacked probable cause to arrest him in the basement of 3037 Sedgley Avenue. Neither argument can prevail.

If it is Plaintiff's contention that his seizure was elevated to a de facto arrest, the Court "must look at the intrusiveness of all aspects of the incident in the aggregate" to make that determination.[53] Plaintiff must demonstrate more than the fact that Gibbs and O'Kane configured their patrol cars to prevent his car from advancing. It is settled law in the Third Circuit that "police actions in blocking a suspect's vehicle . . . does [sic] not constitute an arrest . . . ."[54]

In Edwards, police officers responded to an all-points bulletin that a credit card fraud was in progress at a New Jersey bank. While responding to the initial bulletin, a police officer heard a second radio message describing a red convertible with two occupants and New York license plate that was parked outside the bank, which was believed to be involved in the suspected bank fraud.[55] Arriving at the scene, one officer "pulled his patrol car in front of the [vehicle]" while another officer

---

[52] Id.

[53] Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995).

[54] United States v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995).

[55] Id. at 617.

13

in a second patrol car "boxed the [vehicle] in . . . to prevent or inhibit an escape attempt."[56] Thereafter, police approached the car, retrieved a jacket from the driver's lap, patted the jacket down, and discovered several false identifications and credit cards. Respondent was arrested and charged with possession and use of counterfeit credit cards.[57]

Respondent argued that because he "was not free to leave the scene" the investigative stop escalated into an arrest.[58] But the Third Circuit rejected this contention, noting that the "not free to leave" test does not demarcate the line between an investigative stop and an arrest; instead, that "concern marks the line between a fourth amendment [sic] seizure of any degree and a consensual encounter which does not require any minimal objective justification."[59]

In light of the prevailing law, Plaintiff's contention that he was arrested solely on the basis of the fact that Gibbs and O'Kane obstructed his car lacks merit. The determinative factor in assessing whether Plaintiff's seizure elevated to an arrest is the level of intrusiveness Plaintiff was caused to endure during the seizure. Plaintiff was seized only for an instant, then he ran headlong into the streets. Additionally, Gibbs and O'Kane imposed no force on Plaintiff's person when they eliminated his potential vehicular escape route. Given these facts, Plaintiff endured minimal intrusiveness, and his seizure did not elevate to a de facto arrest.

It is conceivable that Plaintiff contends, in the alternative, that his arrest in the basement of 3037 Sedgley Avenue was illegal. A warrantless arrest by a police officer "is reasonable

---

[56] Id.

[57] Id. at 617-18.

[58] Id. at 19.

[59] Id. at 620 (quoting United States v. Jones, 759 F.2d 633, 637 (8th Cir. (1985)).

under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."[60] An arrest is supported by probable cause where "at the moment the arrest was made . . . the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense."[61]

Probable cause to arrest Plaintiff materialized during the course of O'Kane's pursuit of Plaintiff. As O'Kane chased Plaintiff, he observed Plaintiff discard a black and gray 'L' shaped object that looked like a gun. That observation, coupled with the fact that Plaintiff fled from the scene where he matched the description of a "man with gun" police radio report gave the police probable cause to arrest him in the abandoned home where they found him.

The police acted with reasonable suspicion when they stopped Plaintiff on the street and with probable cause when they arrested him in the basement. Therefore, Plaintiff's Fourth Amendment rights were not violated. Thus, Plaintiff's section 1983 false arrest/false imprisonment claims fail as a matter of law.

### C.   Malicious Prosecution

Plaintiff next claims malicious prosecution pursuant to section 1983. To prevail on a section 1983 malicious prosecution claim, a plaintiff must establish the elements of the common law tort as well as a deprivation of a constitutional right.[62] In Pennsylvania, a plaintiff suing for malicious prosecution must prove: "(1) the defendant initiated a criminal proceeding; (2) the criminal

---

[60] Wright v. City of Philadelphia, 409 F.3d 595, 601 (3dCir 2005) (quoting Devenpeck v. Alford, __ U.S. __, 125 S.Ct. 588, 593 (2004)).

[61] Id. at 602 (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

[62] Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 791 (3d Cir. 1996).

proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendant acted maliciously or for a purpose other than bringing plaintiff to justice."[63]

In light of the conclusion that Plaintiff's seizure was reasonable, the Court need not address defendants' full slate of arguments on Plaintiff's malicious prosecution claim. As previously discussed, Gibbs and O'Kane had objectively reasonable suspicion to conduct an investigatory stop and had probable cause to arrest Plaintiff upon observing him discard what appeared to be a handgun into a backyard as he fled police. Thus, Plaintiff's prosecution did not lack probable cause, and his malicious prosecution claim, too, fails as a matter of law.

### D. Conspiracy and Bystander Liability

Plaintiff's remaining claims for section 1983 conspiracy and bystander liability emanate from his contention that the defendants deprived him of his constitutional right to be free from unreasonable searches and seizures. These claims also fail as a matter of law on the strength of the Court's finding that Plaintiff's seizure was reasonable. Thus, there is no basis for Plaintiff's contention that the defendants conspired to deprive him of his rights and failed to intervene to prevent others from depriving him of his rights where the Court has concluded that there was no deprivation of his rights.

### E. Qualified Immunity

Defendants refute Plaintiff's arguments on their merits, but also assert the privilege of qualified immunity in the face of Plaintiff's claims. Having addressed the merits of Plaintiff's arguments, the Court briefly addresses Defendants' qualified immunity defense. The purpose of qualified immunity is to protect state officials "from undue interference with their duties and from

---

[63] Id.

potentially disabling threats of liability."[64] However, a section 1983 plaintiff can defeat the shield of qualified immunity by showing that a state official violated "clearly established statutory or constitutional rights of which a reasonable person would have known."[65] Saucier v. Katz[66] announced a two-prong test for courts to perform to determine whether the privilege of qualified immunity has been overcome. First, courts must determine whether "the facts alleged show the officer's conduct violated a constitutional right" when those facts are taken in the light most favorable to the plaintiff."[67] Where "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."[68] Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."[69]

Applying the Saucier test, Plaintiff is unable to overcome defendants' qualified immunity protection because, as discussed previously, the facts alleged do not show that the officers' conduct violated a constitutional right. It is, therefore, unnecessary for the Court to analyze the issue of qualified immunity further. Absent Plaintiff's ability to show a violation of his constitutional rights, defendants shall enjoy the privilege of qualified immunity to shield them from liability for Plaintiff's claims.

---

[64] Elder v. Holloway, 510 U.S. 510, 514 (1994) (internal quotations omitted).

[65] Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[66] 533 U.S. 194 (2001).

[67] Id. at 201.

[68] Id.

[69] Id.

**IV.** **Conclusion**

      For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

An appropriate ORDER follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TYSON COLEMAN : | |
|      Plaintiff : | |
| : | CIVIL ACTION |
| v. : | No. 02-9065 |
| : | |
| CITY OF PHILADELPHIA, et al. : | |
|      Defendants : | |
| _____: | |

**ORDER**

        **AND NOW**, this 28th day of September 2005, upon consideration of Defendants' Motion for Summary Judgment [Document #17] and the accompanying documents, Plaintiff's Opposition thereto [Document #19] and Defendants' Reply Memorandum [Document #20], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** as follows:

        1. Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's 42 U.S.C. § 1983 false arrest/false imprisonment, malicious prosecution, conspiracy, and bystander liability claims. Judgment is hereby entered in favor of Defendants and against Plaintiff. Counts I, II, VII, and VIII are **DISMISSED WITH PREJUDICE**; and

        2. The Clerk of Court shall mark this case **CLOSED** for statistical purposes.

It is so **ORDERED**.

                                                      **BY THE COURT:**

                                                      Cynthia M. Rufe, J.